NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0419n.06
Filed: June 20, 2007

No. 04-5874

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Maralyn S. James, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Metropolitan Government of Nashville | ) | |
| and Davidson County Nashville Public | ) | |
| Library, | ) | |
| | ) | **OPINION** |
| Defendant-Appellants. | ) | |
| _____ | ) | |

**Before: GILMAN and COOK, Circuit Judges, and MILLS, District Judge.**[*]

**RICHARD MILLS, District Judge.**

## I. PROCEDURAL HISTORY

The Metropolitan Government of Nashville and Davidson County operates

the Nashville Public Library (collectively "the Government"). Maralyn James

began working for the Library in 1971 as a "Librarian I." James sued the

_____

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

1

Government on April 30, 2003, alleging claims under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12111, *et seq.*, the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The district court dismissed the ADA and ADEA claims on summary judgment and James proceeded to trial on her Title VII hostile work environment and retaliation claims. On May 14, 2003, the jury found the Government liable for retaliation and awarded James $42,000 in compensatory damages.

The Government moved to have the verdict set aside under Federal Rule of Civil Procedure 50(a), claiming that the evidence did not show that James suffered an adverse employment action. The district court denied the Government's motion.

We reversed the district court and remanded. *See James v. Metropolitan Government of Nashville*, 159 F.App'x 186 (6th Cir. 2005). Subsequent to our decision, the Supreme Court decided *Burlington Northern & Santa Fe Railway Co. v. White*, — U.S. —, 126 S.Ct. 2405 (2006), addressing whether Title VII retaliation must be employment or workplace related and how harmful an action must be to constitute retaliation. *Id.* at 2416. James appealed our decision, and the Supreme Court reversed and remanded in light of *Burlington Northern*. *See James*

*v. Metropolitan Government of Nashville*, — U.S. —, 127 S.Ct. 336, 166 L.Ed.2d 7 (2006).  Applying *Burlington Northern*, we consider whether the district court should have granted the Government's Rule 50(a) motion.

## II.  FACTS

As recounted in our previous decision, James acquired records, raised funds, catalogued materials, and performed other tasks as a Librarian 1.  From 1971 to 1994, she received performance ratings primarily of "outstanding" and "above average."  In 1994, the Library transferred James to its main branch and promoted her to "Librarian I-and-a-half."  In 1996, James received a negative performance evaluation with respect to the speed of her work. She knew that she was not cataloguing materials as quickly as her coworkers.

In July 1999, James became a "Librarian II" via a reclassification of library job titles.  Her responsibilities remained unchanged and the speed of her work remained unsatisfactory.  Performance evaluations from 1996 through 2001 consistently criticized James' output.  For instance, James' 1999 performance evaluation noted that she was cataloguing "just over 2 titles per hour (as opposed to the 7-8 expected) . . . Continued low output in her primary job responsibility is not acceptable and will have serious consequences if the situation is not corrected."

3

On October 1, 2001, James' supervisor, Linda Neff, gave James a deadline to catalogue a collection of books. James considered the deadline unfair and the resulting stress led her to seek medical attention for headaches and high blood pressure. James' doctor, Michael Callaway, M.D., advised her to take several days off work. He also sent the Library a letter notifying it that James was "to limit stress at work, specifically no overtime and working at a pace consistent with her abilities due to her medical condition." Dr. Callaway later diagnosed James as having "mild cognitive dysfunction relating to stress at work."

On October 3, James wrote a letter complaining that she was being subjected to "harassment" and a "hostile work environment." James requested a transfer because the hostility was detrimental to her health. One of the letter's recipients, Library Director Donna Nicely, called James into her office on October 9 to discuss James' complaint. Supervisors Suliang Feng and Chase Adams were present at the meeting. Adams told James "if you will just volunteer to take a demotion, this will all be over with." James did not volunteer to take a demotion and the Library did not approve her transfer. The Library investigated her complaint and on October 31, 2001, concluded it had no merit.

By the end of 2001, James' poor productivity caused her to fail an annual evaluation. The Library advised James that she would be fired if her productivity

4

did not improve. On January 29, 2002, James filed an EEOC charge against the Government alleging age discrimination, disability discrimination, and retaliation. She received a "right to sue letter" on January 31, 2002. That same day, James submitted a letter seeking a lateral transfer to "Librarian II-audio visual." Despite being ranked first on the list of applicants, James did not receive an interview.

The Library scheduled a performance re-evaluation for James on March 1, 2002, but the re-evaluation was postponed for a month at James' request. By April 1, James was unable to catalogue an average of 6 items per hour, a goal the Library had given her. The Library did not discipline James. Instead, it gave her time to improve her productivity and offered to assist her in that regard. To that end, the Library accommodated James' request to adjust lights around her computer and provide her with special computer glasses. The Library also offered techniques for James to improve her output.

James filed a second retaliation claim with the EEOC and received a "right to sue" letter on April 16, 2002. She sued the Library and the Metropolitan Government of Nashville and Davidson County on April 30, 2002.

The Library gave James until May 16, 2002, to increase her catalogue average to 6 items per hour. By May 9, James was averaging 5.75 items per hour. However, on May 13, 2002, James' neurologist, Dr. Alan Bachrach, informed the

5

Library that James could not return to her job because she could not keep up with the quotas. That same day, James wrote the Government's benefits department to say that if the Library did not accommodate her with a position at her current level of Librarian II, she would apply for a disability pension.

In June 2002, the Library offered to transfer James to a Librarian I position. James refused the demotion and applied for a disability pension. On November 19, 2002, the Library informed James that if she did not accept a demotion she would be charged as absent without leave and subject to disciplinary action.

The Library informed the Benefits Board that it "offered to accommodate [James] at a lesser position with current salary." However, the Library did not disclose that the salary for the lesser position would, after three months, be reduced to a level that was less than James' Librarian II salary. Because the Library said it could accommodate James, the Benefits Board rejected her claim for a disability pension on April 2, 2003. James sought reconsideration, which was also denied.

James received her last paycheck in March 2003. When she noticed that her family health insurance premium had not been deducted, she immediately notified the Government. James took a $209.20 personal check to the Government's payroll department to pay her premium. She continued to make payments each

month her disability pension appeal was pending. In late July 2003, James received a letter from CIGNA cancelling her family health insurance due to non-payment of premiums. However, the letter was a mistake and the insurance was never cancelled. She took an early service pension and terminated her employment on or about March 1, 2003.

James sued the Government, and the jury decided in her favor on a Title VII retaliation claim. The Government moved for judgment under Rule 50(a). The district court denied the motion, but we reversed. *See James*, 159 F.App'x 186. The Supreme Court reversed and remanded our decision pursuant to *Burlington Northern*. *See James*, 127 S.Ct. 336. Upon remand, we again conclude that the Government is entitled to judgment under Rule50(a).

### III. STANDARD OF REVIEW

This court reviews a district court's denial of a motion for judgment as a matter of law *de novo*. *Estate of Riddle ex rel. Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 408 (6th Cir. 2005). The court views the evidence in the light most favorable to the nonmoving party. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). It will affirm the jury's verdict unless there was "no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party." *See Fed.R.Civ.P. 50(a).*

7

## IV. ANALYSIS

"In an action under Title VII, the plaintiff may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Absent direct evidence of retaliation, as is the case here, retaliation claims are subject to the same McDonnell Douglas burden-shifting framework as discrimination claims. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563-64 (6th Cir. 2004). To establish a prima facie case of retaliation, James had to show (1) she engaged in activity protected by Title VII, (2) the Government knew she engaged in this activity, (3) the Government subjected her to an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. *Singfield*, 389 F.3d at 563.

"If and when a plaintiff has established a prima facie case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The plaintiff must then demonstrate "that the proffered reason was not the true reason for the employment decision." *Id.* (quoting *Texas Dept. of*

8

*Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  The employer may also prove an affirmative defense to retaliatory harassment by a supervisor by demonstrating: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

### A.  Adverse Employment Actions

In *Burlington Northern*, the Supreme Court considered just how harmful an action must be to constitute retaliation.  126 S.Ct. at 2415.  The Court explained that for conduct to become actionable retaliation "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 2415 (citations and quotation marks omitted).

At trial, James produced evidence of various harms the Government allegedly caused her (*i.e.*, denial of lateral transfers, bad employment evaluations, and the imposition of cataloguing quotas.).  Prior to *Burlington Northern*, those

9

harms were not adverse employment actions. *See Sherman v. Chrysler Corp.*, 47 F.App'x 716, 721-22 (6th Cir. 2002) (unpublished)(denial of lateral transfer is not an adverse employment action under the ADEA); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999) (an unfavorable evaluation without an accompanying adverse employment action, such as a lower wage, is not actionable as a Title VII retaliation claim); *Agnew v. BASF Corp.*, 286 F.3d 307, 10 (6th Cir. 2002) (requiring an employee to comply with a reasonable performance plan or be subject to discipline does not constitute an adverse employment action under the ADEA). After *Burlington Northern*, excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement is materially adverse conduct. *Id*. at 2415-16. Markedly worse performance evaluations that significantly impact an employee's wages or professional advancement are also materially adverse. *See Halfacre v. Home Depot, U.S.A., Inc.*, 2007 WL 1028860, *9 (6th Cir. 2007).

Many of the adverse actions James complains about preceded her 2002 Title VII charges. Nevertheless, it is true that the Government denied James's request for a lateral transfer, gave her bad employment evaluations, and imposed cataloguing quotas after she filed her charges with the EEOC. However, it is also true that none of these things James complained about significantly affected her

professional advancement. James continued to work and she received the same pay despite her Title VII claims. She also continued to receive the bad evaluations, but those were not markedly worse than earlier ones and the evaluations did not affect her earnings. Her employment conditions were essentially unchanged after she filed with the EEOC. James's allegations are not actionable because they failed to significantly impact her professional advancement and would not have dissuaded a reasonable person from filing a Title VII claim.

James also contended that the Government's opposition to her disability application, the "cancellation" of her family's health insurance, its "misrepresentation" about paying her the same salary to work a lesser position, and the reduced service pension it paid her are adverse employment actions.[1] James's contentions are incorrect.

James was not entitled to disability benefits because she was able to perform work as a Librarian I. The position was comparable to her cataloguing position and the Government offered her the Librarian I job as a reasonable

---

[1] Although these events occurred after James left the workplace, post-employment injuries can be actionable under Title VII. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 339, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (holding that the term "employees," as used in Title VII's anti-retaliation provision, includes former employees bringing suit for retaliatory, post-employment actions, such as a negative reference to a potential employer).

accommodation. Since James was not entitled to disability benefits, the Government could not support her disability application. While James claimed that the Government misrepresented the fact that the Librarian I position paid less than her current salary, the record shows that James informed the Benefits Board that her salary would be slightly lower if she accepted the lesser position. The Board's decision to deny James a disability pension despite the discrepancy shows that the Government's "misrepresentation" did not affect the Board's decision. Thus, James suffered no adverse employment action via the alleged misrepresentation or cancellation.

James also failed to show that her family's insurance was cancelled. The testimony showed that an insurance company (not the Government) sent James a letter cancelling her family's health insurance. However, the letter was a mistake and the insurance was never cancelled.

The closest James came to establishing an adverse employment action was when she alleged that the Government reduced her service pension. Prior to James' retirement, John Kennedy, the Government's Assistant Director of Human Resources, provided James a chart showing that her pension would be $1,803.66 per month if she ended her service on March 1, 2003, at age 55 and a half. James ended her service at that time, but her monthly pension turned out to be $1,506.06.

12

Although James contended that the smaller pension was evidence of retaliation, the chart plainly explained that any person who retired before reaching age 60 would have his or her pension reduced by 4% per year. Thus, James' pension was reduced to $1,506.06 per month because she retired early. It was not reduced due to retaliation. Even if the chart was somehow unclear or wrongly explained, James never contended that the Government used the chart to fraudulently induce her retirement and she never argued that she detrimentally relied on the chart.

### B. Severe or Pervasive Retaliatory Harassment by a Supervisor

Alternatively, James argues that the jury could have returned a verdict in her favor based on severe or pervasive retaliatory conduct. Evidence of severe or pervasive supervisor harassment following a discrimination complaint can constitute retaliation for purposes of Title VII. *See Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) (citation and quotation marks omitted). The harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "[T]his test has both an objective and a subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that

13

environment as hostile or abusive." *Id*. (citation omitted).

The only evidence James offers to show "severe or pervasive harassment" is the Government's opposition to her disability benefits application and "cancellation" of her health insurance. Because the Government was not responsible for the mistaken cancellation letter James received, the only action James can complain about is the Government's opposition to her disability benefits application. As explained earlier, James was not entitled to benefits. The Government's failure to support an undeserving application is not harassment.

## V. CONCLUSION

Upon reconsideration in light of *Burlington Northern*, we find James did not present evidence sufficient for a jury to find in favor of her retaliation claim. We therefore REVERSE the district court's decision to deny the Government's Rule 50 motion and remand for proceedings consistent with this opinion.